## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GIA LEWIS GROWS,**<br>　　　　　**Plaintiff,**<br><br>VS.<br><br>**UNION CARBIDE CORPORATION,**<br>　　　**et al.,**<br>　　　　　**Defendants.** | CIVIL ACTION NO. 2:22-cv-00794<br><br>SECTION S<br><br>DISTRICT JUDGE LEMMON<br><br>MAGISTRATE JUDGE NORTH |

### AMENDED COMPLAINT AND REQUEST FOR TRIAL BY JURY

Gia Lewis Grows, through undersigned counsel, represents, upon information and belief, the following:

### INTRODUCTION

1. Gia Lewis Grows has lived near a petrochemical manufacturing facility near Hahnville operated by Union Carbide Corporation and/or Dow Chemical Company ("the facility") that has emitted dangerous levels of Ethylene Oxide ("EtO") for decades and which continues to emit dangerous levels of EtO as of the filing of this Petition. Gia Lewis Grows contracted breast cancer as a result of the emission of EtO from the facility and Gia Lewis Grows continues to be at risk for developing additional health problems in the future due to continued exposure to EtO from the facility which has never abated at any time. The Defendants have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding

the facility to maximize their profits without ever informing Plaintiff or the rest of the surrounding community of the life-threatening effects of the facility's EtO emissions.

2. EtO is a cancer-causing gas.

3. The United States Environmental Protection Agency (EPA), the National Toxicology Program, the World Health Organization, and the International Agency for Research on Cancer (IARC) all classify EtO as a known human carcinogen.

4. Over decades and continuing to the present day, the facility has emitted many hundreds of tons of EtO into the air, forcing Plaintiff to breathe its toxic emissions day after day.

5. Although the owners and operators of the facility know and have long known of hazards of EtO, they have chosen to protect their profits rather than the health of their neighbors and have continued to emit dangerous levels of EtO in amounts that caused the surrounding communities to have dangerously high EtO concentrations.

6. EtO is colorless and odorless and therefore Plaintiff has never been able to see or smell the EtO that is in the air around them and which she has breathed.

7. Plaintiff was unknowingly exposed to and inhaled dangerous levels of EtO in the air from the facility.

8. Plaintiff's inhalation of the EtO emitted from the facility was a substantial factor in causing her to develop breast cancer.

9. The continued emission of EtO from the facility continues to cause damage by weakening Plaintiff's current medical condition and increasing the risk of Plaintiff developing new health problems.

## **PLAINTIFF**

10. Gia Lewis Grows is person of the age of majority who is domiciled in St. Charles parish. Ms. Grows has been and continues to be exposed to EtO from the facility at her home located at 128 Dufresne Dr Vacherie, LA 70090 and was exposed at her home located 425 Killona Drive, Killona, LA 70057 for her whole life until 2007. She is 47 years old and was diagnosed with breast cancer July 20, 2015. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

## **DEFENDANTS**[1]

11. Dow Chemical Company ("Dow") is a corporate organized under the laws of Delaware with its principal place of business in Michigan.

---

[1] Plaintiff originally filed her suit in Louisiana state court, along with six other co-plaintiffs, naming Louisiana citizens Jackie Yaworski, Jorge Cerame, Donald Eastepp, Brian Eiler, and Michael Faulkner as defendants (collectively "the Facility Manager Defendants") and asserting claims against the Facility Manager Defendants under Louisiana law for negligence and civil battery.

Defendants Dow and Union Carbide removed the case to this Court based on the alleged fraudulent joinder of the Facility Manager Defendants, and the case was captioned *Terri Cambre, et. al. v. Union Carbide, et. al.* and assigned number 2:21-cv-1067 before Judge Sarah Vance ("the *Cambre* suit").

Plaintiff moved to remand the *Cambre* suit based on lack of subject matter jurisdiction [2:21-cv-1067, Rec. Doc. 21] because Plaintiff had asserted viable claims under Louisiana law against the Facility Manager Defendants, five of whom were non-diverse from Plaintiff. Judge Vance denied Plaintiff's Motion to Remand and dismissed the claims against the diverse and non-diverse Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38].

Plaintiff contends that the Order and Reasons denying remand [2:21-cv-1067, Rec. Doc. 38] was erroneous and that Plaintiff's allegations and claims against the Facility Manager Defendants were sufficient under Louisiana law to state a plausible claim for negligence and civil battery and should not have been dismissed. Consequently, Plaintiff contends that this Court does not have jurisdiction to hear this matter because Louisiana citizens Jackie Yaworski, Jorge Cerame, Donald Eastepp, and Brian Eiler were properly named as defendants in the original petition, and the dismissal of them based on fraudulent joinder was reversible error.

12. Union Carbide Corporation ("Union Carbide") is a corporation organized under the laws of New York with its principal place of busines in Texas. Upon information and belief, Union Carbide has operated the facility since 1966 and has been a wholly owned subsidiary of Dow since 2001.

## FACTUAL BACKGROUND

13. Ethylene oxide is a flammable, colorless gas used to make other chemicals that are used in making a range of products, including antifreeze, textiles, plastics, detergents and adhesives. Ethylene oxide also is used to sterilize equipment and plastic devices.[2]

14. The facility emits huge volumes of EtO every year into the community where Plaintiff resides and the emissions continue at this time.

15. People cannot see or smell ethylene dioxide and, consequently, Plaintiff has been exposed to EtO from the facility for many years without her knowledge while Defendants knew, or should have known, that that the EtO from the facility was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

16. EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly

---

Nonetheless, in compliance with the Court's Orders and Reasons in the *Cambre* suit (1) dismissing Plaintiff's claims against the Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38] and (2) severing Plaintiff's claims from the *Cambre* suit and directing Plaintiff to file an amended complaint in the instant matter [2:21-cv-1067, Rec. Doc. 54], Plaintiff is filing this Amended Complaint which does not name Jackie Yaworski, Jorge Cerame, Donald Eastepp, Brian Eiler, and Michael Faulkner as defendants and does not assert claims against them. However, Plaintiff expressly reserves all appellate and other rights regarding the Order and Reasons in the *Cambre* suit dismissing the claims against the Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38].

[2]   https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades in the industrial community, but not to the general population.

17. Studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer.

18. The DNA-damaging properties of EtO have been studied since the 1940s.

19. U.S. companies became broadly aware of EtO's carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health (NIOSH) recommended that EtO be considered as mutagenic and potentially carcinogenic to humans.[3]

20. Union Carbide was specifically aware of the effects of EtO because the 1977 NIOSH study was based on workers at a Union Carbide facility in South Carolina.

21. In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[4]

22. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

23. California declared EtO as a human carcinogen in 1987.

---

[3]  Center for Disease Control & Prevention, Special Occupational Hazard Review with Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html

[4]  Center for Disease Control, Current Intelligence Bulletin 35, May 1981, Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

24. In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification.

25. In 2000, the U.S. Department of Health and Human Services revised classified EtO as "known to be a human carcinogen."

26. In 2002, the U.S. National Toxicology Program classified EtO as "known to be a human carcinogen" based on "sufficient evidence of carcinogenicity from studies in humans."

27. NIOSH published a study in 2004 found positive exposure-response trends for lymphohematopoietic cancer mortality in males and for breast cancer mortality in females.

28. An EPA advisory panel agreed in 2007 that EtO is a carcinogen and advised the EPA to make improvements to risk assessments.

29. In 2007, the American Chemistry Counsel and Ethylene Oxide/Ethylene Glycols Panel, of which Dow is a member, published a manual regarding EtO and noting the association between EtO and breast and blood cancers.

30. In 2009, California added EtO to list of toxic substances.

31. The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults that previously thought. The EPA considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.

**Emissions from the Facility**

32. The facility emits huge volumes of EtO gas every year which emissions contaminate the air in communities in proximity to the facility.

33. The EtO emitted by the facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing

winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff breathes long after it has been emitted.[5]

34. Defendants operate the facility without sufficient pollution controls to limit and/or eliminate the emissions of toxic EtO and, as a result, exposed and continues to expose Plaintiff to a carcinogenic, mutagenic chemical that materially diminished her health, has increased the likelihood of her developing cancer, and continues to cause successive damages to her body as a result of its mutagenic (DNA-damaging) characteristics.

35. For at least the past 40 years, the facility has annually emitted tens of thousands of pounds of EtO, and, at times (including as recently as 2013 and 2014), it has emitted well over 40,000 pounds in a single year. Although emission levels are reported to have decreased in the last few years as a result of growing public awareness of EtO's dangers and pressure from the EPA and the public on Union Carbide, the facility continues to emit dangerous levels of EtO that place those living around the facility at an increased risk of developing cancer.

36. Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized amounts of EtO into the air and water, which releases are caused by leaks, faulty equipment, and other negligence that has increased the volume of EtO in the atmosphere around the facility and in the community, including just by way of example, an unauthorized release of over 850 pounds of EtO into the atmosphere in September 2020 as a result of a leak and a failed seal.

**The Risk of Cancer Near the Facility is the Highest in the U.S.**

---

[5] https://www.ncbi.nlm.nih.gov/books/NBK321408/

37. In August 2018, after the EPA released the results of the 2014 National Air Toxics Assessment ("NATA") of EtO (and other toxics), it became harder for the defendants to ignore or attempt to deny the hazardous nature of EtO. The 2014 NATA—which estimated concentrations of airborne toxins and population exposure and calculated the associated risks of cancer and other serious health problems—reflects that there are dangerous levels of airborne EtO in certain census tracts around the facility. Even worse, the report calculated that individuals living in those census tracts around the facility, which includes Plaintiff, have some of the highest risks of cancer from EtO exposure in the country up to seven times what the EPA considers an acceptable risk. On information and belief, the 2014 NATA results were not communicated to any lay persons and the citizens of St. Charles Parish, although the EPA inspector general issued a management alert that called on the EPA, state, and/or local officials to provide information about EtO to Plaintiff. There was no public awareness initiative or campaign by Union Carbide, Dow, or the local or federal government to educate the community. Although Defendants acknowledged reviewing the NATA report regarding the dramatically increased risk of cancer its EtO emissions created for the persons working and living around the facility and gave lip-service to "exploring" "ethylene oxide emission reduction opportunities" at its facility, it has continued to emit large volumes of EtO into the atmosphere.

38. In April 2021, the EPA's Office of Inspector General (OIG) issued a report expressing serious concern over the levels of EtO emissions from certain facilities across the country – one being Union Carbide's Hahnville facility – and the resulting unacceptable cancer risks for individuals living near those facilities. The OIG called on the EPA to conduct risk assessments of the identified facilities and to develop new emissions standards for facilities

emitting EtO that are creating such unreasonable risks for the community. The EPA's assessment confirmed that individuals living near the Union Carbide facility have a risk of developing cancer that is seven times what the EPA considers to be "acceptable." Thereafter, the EPA and the Louisiana Department of Environmental Quality (LDEQ) began discussions with Union Carbide about the need for it to reduce the facility's EtO emissions.

39. In a public webinar that the EPA hosted in August 2021 specifically regarding EtO and Union Carbide's plant, Union Carbide's Site Leader (Denise DeLaune) acknowledged that Union Carbide and the facility have a responsibility to keep the community safe from any harm caused by the plant's EtO operations and emissions, stating that "no Community should bear an adverse environmental health outcome as a result of our operations." Ms. DeLaune also stated: "We know it's our responsibility to our Community, to use the best available, science and technology to end advanced monitoring capabilities to reduce emissions."

40. Notwithstanding Ms. DeLaune's public statements and acknowledgements of the duties Union Carbide has to "its" community, the plant and the individuals who manage and make decisions for it did nothing to protect the public for many years and has only recently started taking steps to reduce emissions as a result of government, regulatory, and public pressure.

**Defendants' continued actions continue to cause injury to Plaintiff**

41. The facility has continuously emitted dangerous levels of EtO that are inhaled by Plaintiff and the tortious emission of EtO has never abated.

42. Plaintiff continues to suffer injury as a result of the Defendants' failure to abate the dangerous emission of EtO.

43. Plaintiff has already developed cancer, and Plaintiff also has an increased risk of developing additional illnesses, including additional cancer, as a result of the unabated emission of

dangerous levels of EtO from the facility. Plaintiff's body is continuing to be damaged by the continuous exposure to EtO emissions at the cellular level, and Plaintiff has a reasonable fear of developing additional cancers and illnesses.

44. Plaintiff's injuries to date and risk of future health problems are both the result of continuous, indivisible, and compounding tortious activities by Defendants.

**Plaintiff did not reasonably know that it was the Defendants' acts
and omissions described above that caused their injuries and damages
until less than a year before this lawsuit was filed. (all plaintiff except**

45. As a result of the above-described acts and omissions by the Defendants, exposure to the unsafe levels of EtO from the Facility was a substantial factor in Plaintiff's development of cancer and is a substantial factor in development of future health problems.

46. Defendants' misrepresentations about the carcinogenic quality of EtO impeded Plaintiff's ability to assert the causes of action stated herein and Defendants' actions and inactions did, in fact, delay Plaintiff's discovery that the cancers and risks of cancer alleged herein had been caused by exposure to EtO.

47. Although Plaintiff was diagnosed with cancer more than a year before filing suit, Plaintiff did not know or should not have reasonably known that her cancer was caused by exposure to the EtO emitted by the facility before one year prior to the date of the original Petition.

48. Plaintiff continues to be exposed to unsafe levels of EtO from the facility, suffers successive damages to her body and mind as a result of her continuous exposure to the dangerous emissions, and faces an ongoing risk of adverse effects to her health and development of additional cancer.

49. Gia Lewis Grows lived within 3 miles of the facility until 2007 and was diagnosed with breast cancer in July of 2015. Despite discussions with her doctors, no physician ever advised

her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

## CAUSES OF ACTION

### Count 1 – Negligence of Union Carbide and/or Dow

50. Union Carbide and/or Dow have duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including Plaintiff.

51. Union Carbide and/or Dow knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

52. Union Carbide and/or Dow knew or should have known that that its/their EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

53. As the operator of the facility with control over the levels of EtO released from the facility, Union Carbide and/or Dow owes a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that do not pose an unreasonable risk of harm. Union Carbide and/or Dow has breached that duty by, among other things, emitting EtO from facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including Plaintiff. Furthermore, Union Carbide and/or Dow's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by Plaintiff.

54. Union Carbide and/or Dow's actions were both a cause in fact and legal cause of these harms. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to Plaintiff.

55. The facility has at all relevant times been in the custody and control of Union Carbide and/or Dow.

56. Union Carbide and/or Dow knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including Plaintiff.

57. Union Carbide and/or Dow could have prevented the harms suffered by Plaintiff through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. Union Carbide and/or Dow failed to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

58. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to Plaintiff.

59. Union Carbide and/or Dow has been, and continues to be, negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

    f.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiff to dangerous levels of EtO;

    g.) Failing to know what it should have known;

    h.) Misleading Plaintiff and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

    **Count 2 – Union Carbide and/or Dow's Liability for Civil Battery**

60. At all relevant times, Union Carbide and/or Dow intended to release emissions of EtO from the facility.

61. Union Carbide and/or Dow knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiff.

62. Union Carbide and/or Dow also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

63. Plaintiff did not know that she was inhaling EtO until within the last year before filing her lawsuit and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

64. As a direct and proximate result of the facility's emissions of EtO, Plaintiff was contacted by and inhaled dangerous levels of EtO without her consent.

65. As a direct and proximate result of her nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiff developed cancer and has an increased risk of further serious health risks and medical conditions.

**Count 3 – Union Carbide and/or Dow's Liability under La. C.C. arts. 667-669**

66. Union Carbide and/or Dow has a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. Union Carbide and/or Dow is required to use its property - the facility - in such a manner as not to injure its neighbors.

67. Plaintiff lives near the facility and was, and continues to be, continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of

Plaintiff's cancer and Plaintiff's fear of and risk of developing further health problems. Plaintiff lives or has lived in close proximity to the facility and has been and continues to be damaged by exposure to the dangerous emissions released by the facility.

68. Union Carbide and/or Dow knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including Plaintiff. The damages caused to Plaintiff could have been prevented if Union Carbide and/or Dow had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air upon its purchase of the facility, but it/they for decades failed to take any steps to reduce EtO emissions, and it/they still have not reduced EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to Union Carbide and/or Dow's neighboring community.

**DAMAGES**

69. Because of the aforementioned intentional misconduct and negligence of defendants, Plaintiff has suffered severe and disabling injuries, for which she seeks the following damages:

    a.) Past, present, and future pain and suffering;

    b.) Past, present, and future medical expenses;

    c.) Permanent and/or partial physical disability and/or impairment;

    d.) Scarring and disfigurement;

    e.) Past, present, and future loss of enjoyment of life;

    f.) Future loss of income;

    g.) Future loss of earning capacity;

    h.) The fear and increased likelihood of development of cancer and other fatal and debilitating diseases;

15

      i.) The fear and increased likelihood of development of damage to vital organs, reproductive system and central nervous system

      j.) The fear of early death.

70. Plaintiff prays for a trial by jury.

WHEREFORE, Plaintiff prays that, after due proceedings had, there be judgment herein in favor of Plaintiff and against Defendants for such damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid; for all costs of this proceeding; and for all other general and equitable relief to which they are entitled.

Respectfully Submitted:

/s/ William Barousse
**RICHARD P. VOORHIES III (#30782)**
**WILLIAM A. BAROUSSE (#29748)**
THE VOORHIES LAW FIRM
1100 Poydras Street
Energy Center, Suite 2810
New Orleans, LA 70163
Phone: 504-875-2223
Fax: 504-875-4882
Email: richard@voorhieslaw.com
Email: william@voorhieslaw.com

-and-

**JENNIFER THORNTON (#27109)**
**WILLIAM M. ROSS (#27064)**
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Phone: 504-523-1580
Fax: 504-524-0069