# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GIA LEWIS GROWS,**<br>**Plaintiff,**<br><br>VS.<br><br>**UNION CARBIDE CORPORATION,**<br>**et al.,**<br>**Defendants.** | CIVIL ACTION NO. 2:22-cv-00794<br><br>SECTION S<br><br>DISTRICT JUDGE LEMMON<br><br>MAGISTRATE JUDGE NORTH |

## SECOND AMENDED COMPLAINT AND REQUEST FOR TRIAL BY JURY

Gia Lewis Grows, through undersigned counsel, represents, upon information and belief, the following:

## INTRODUCTION

1. Gia Lewis Grows has lived near a petrochemical manufacturing facility near Hahnville operated by Union Carbide Corporation and/or Dow Chemical Company ("the facility") that has emitted dangerous levels of Ethylene Oxide ("EtO") for decades and which continues to emit dangerous levels of EtO as of the filing of this Petition. Gia Lewis Grows contracted breast cancer as a result of the emission of EtO from the facility and Gia Lewis Grows continues to be at risk for developing additional health problems in the future due to continued exposure to EtO from the facility which has never abated at any time. The Defendants have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding

1

the facility to maximize their profits without ever informing Plaintiff or the rest of the surrounding community of the life-threatening effects of the facility's EtO emissions.

2. EtO is a cancer-causing gas.

3. The United States Environmental Protection Agency (EPA), the National Toxicology Program, the World Health Organization, and the International Agency for Research on Cancer (IARC) all classify EtO as a known human carcinogen.

4. Over decades and continuing to the present day, the facility has emitted many hundreds of tons of EtO into the air, forcing Plaintiff to breathe its toxic emissions day after day.

5. Although the owners and operators of the facility know and have long known of hazards of EtO, they have chosen to protect their profits rather than the health of their neighbors and have continued to emit dangerous levels of EtO in amounts that caused the surrounding communities to have dangerously high EtO concentrations.

6. EtO is colorless and odorless and therefore Plaintiff has never been able to see or smell the EtO that is in the air around them and which she has breathed.

7. Plaintiff was unknowingly exposed to and inhaled dangerous levels of EtO in the air from the facility.

8. Plaintiff's inhalation of the EtO emitted from the facility was a substantial factor in causing her to develop breast cancer.

9. The continued emission of EtO from the facility continues to cause damage by weakening Plaintiff's current medical condition and increasing the risk of Plaintiff developing new health problems.

**PLAINTIFF**

10. Gia Lewis Grows is person of the age of majority who is domiciled in St. Charles parish. Ms. Grows has been and continues to be exposed to EtO from the facility at her home located at 128 Dufresne Dr., Vacherie, LA 70090 and was exposed at her home located 425 Killona Drive, Killona, LA 70057 for her whole life until 2007. She is 47 years old and was diagnosed with breast cancer July 20, 2015. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

**DEFENDANTS**[1]

11. Dow Chemical Company ("Dow") is a corporate organized under the laws of Delaware with its principal place of business in Michigan.

---

[1] Plaintiff originally filed her suit in Louisiana state court, along with six other co-plaintiffs, naming Louisiana citizens Jackie Yaworski, Jorge Cerame, Donald Eastepp, Brian Eiler, and Michael Faulkner as defendants (collectively "the Facility Manager Defendants") and asserting claims against the Facility Manager Defendants under Louisiana law for negligence and civil battery.

Defendants Dow and Union Carbide removed the case to this Court based on the alleged fraudulent joinder of the Facility Manager Defendants, and the case was captioned *Terri Cambre, et. al. v. Union Carbide, et. al.* and assigned number 2:21-cv-1067 before Judge Sarah Vance ("the *Cambre* suit").

Plaintiff moved to remand the *Cambre* suit based on lack of subject matter jurisdiction [2:21-cv-1067, Rec. Doc. 21] because Plaintiff had asserted viable claims under Louisiana law against the Facility Manager Defendants, five of whom were non-diverse from Plaintiff. Judge Vance denied Plaintiff's Motion to Remand and dismissed the claims against the diverse and non-diverse Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38].

Plaintiff contends that the Order and Reasons denying remand [2:21-cv-1067, Rec. Doc. 38] was erroneous and that Plaintiff's allegations and claims against the Facility Manager Defendants were sufficient under Louisiana law to state a plausible claim for negligence and civil battery and should not have been dismissed. Consequently, Plaintiff contends that this Court does not have jurisdiction to hear this matter because Louisiana citizens Jackie Yaworski, Jorge Cerame,

12. Union Carbide Corporation ("Union Carbide") is a corporation organized under the laws of New York with its principal place of busines in Texas. Upon information and belief, Union Carbide has operated the facility since 1966 and has been a wholly owned subsidiary of Dow since 2001.

## FACTUAL BACKGROUND

13. Ethylene oxide is a flammable, colorless gas used to make other chemicals that are used in making a range of products, including antifreeze, textiles, plastics, detergents and adhesives. Ethylene oxide also is used to sterilize equipment and plastic devices.[2]

14. The facility emits huge volumes of EtO every year into the community where Plaintiff resides and the emissions continue at this time.

15. People cannot see or smell ethylene dioxide and, consequently, Plaintiff has been exposed to EtO from the facility for many years without her knowledge while Defendants knew, or should have known, that that the EtO from the facility was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

---

Donald Eastepp, and Brian Eiler were properly named as defendants in the original petition, and the dismissal of them based on fraudulent joinder was reversible error.

Nonetheless, in compliance with the Court's Orders and Reasons in the *Cambre* suit (1) dismissing Plaintiff's claims against the Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38] and (2) severing Plaintiff's claims from the *Cambre* suit and directing Plaintiff to file an amended complaint in the instant matter [2:21-cv-1067, Rec. Doc. 54], Plaintiff is filing this Amended Complaint which does not name Jackie Yaworski, Jorge Cerame, Donald Eastepp, Brian Eiler, and Michael Faulkner as defendants and does not assert claims against them. However, Plaintiff expressly reserves all appellate and other rights regarding the Order and Reasons in the *Cambre* suit dismissing the claims against the Facility Manager Defendants [2:21-cv-1067, Rec. Doc. 38].

[2] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

16. EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades in the industrial community, but not to the general population.

17. Scientific and industry studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer.

18. The DNA-damaging properties of EtO have been studied since the 1940s.

19. U.S. companies became broadly aware of EtO's carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health (NIOSH) recommended that EtO be considered as mutagenic and potentially carcinogenic to humans.[3]

20. Union Carbide was specifically aware of the effects of EtO because the 1977 NIOSH study was based on workers at a Union Carbide facility in South Carolina.

21. In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[4]

---

[3] Center for Disease Control & Prevention, Special Occupational Hazard Review with Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html

[4] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

22. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

23. California declared EtO as a human carcinogen in 1987.

24. In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification.

25. In 2000, the U.S. Department of Health and Human Services revised classified EtO as "known to be a human carcinogen."

26. In 2002, the U.S. National Toxicology Program classified EtO as "known to be a human carcinogen" based on "sufficient evidence of carcinogenicity from studies in humans."

27. NIOSH published a study in 2004 found positive exposure-response trends for lymphohematopoietic cancer mortality in males and for breast cancer mortality in females.

28. An EPA advisory panel agreed in 2007 that EtO is a carcinogen and advised the EPA to make improvements to risk assessments.

29. In 2007, the American Chemistry Counsel and Ethylene Oxide/Ethylene Glycols Panel, of which Dow is a member, published a manual regarding EtO and noting the association between EtO and breast and blood cancers.

30. In 2009, California added EtO to list of toxic substances.

31. The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults that previously thought. The EPA considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.

## Emissions from the Facility

32. The facility emits huge volumes of EtO gas every year which emissions contaminate the air in communities in proximity to the facility.

33. The EtO emitted by the facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff breathes long after it has been emitted.[5]

34. Defendants operate the facility without sufficient pollution and leak controls to reasonably limit and/or eliminate the emissions of toxic EtO and, as a result, exposed and continue to expose Plaintiff to a carcinogenic, mutagenic chemical that materially diminished her health, caused her to develop cancer, increases the likelihood of her developing other cancers and health problems, and continues to cause successive damages to her body as a result of its mutagenic (DNA-damaging) characteristics.

35. For at least the past 40 years, the facility has annually emitted tens of thousands of pounds of EtO, and, at times (including as recently as 2013 and 2014), it has emitted well over 40,000 pounds in a single year. Although emission levels are reported to have decreased in the last few years as a result of growing public awareness of EtO's dangers and pressure from the EPA and the public on Union Carbide, the facility continues to emit dangerous levels of EtO that place those living around the facility at an increased risk of developing cancer. The EPA characterizes the Union Carbide's levels of emissions as not "sufficiently protective of human health."

---

[5] https://www.ncbi.nlm.nih.gov/books/NBK321408/

36. Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized and unplanned amounts of EtO into the air and water, which fugitive releases are caused by undetected and unrepaired leaks, faulty equipment, and other negligence. Fugitive EtO emissions from the facility have dramatically increased the volume of EtO in the atmosphere around the facility and in the community, including just by way of example, an unauthorized release of over 850 pounds of EtO into the atmosphere in September 2020 because of a leak and a failed seal. In many years, going back at least to the 1980's, the facility's unplanned fugitive emissions are at approximately the same levels as the planned "controlled" emissions, thereby doubling the amount of EtO in the atmosphere from the facility. It is not unusual for the unplanned fugitive emissions from the plant to be even greater than the planned emissions, sometimes as great as three times the levels of the "controlled" emissions and thereby significantly contributing to the dangerous levels in the air in the Plaintiff's community.

**The Risk of Cancer Near the Facility is the Highest in the U.S.**

37. On information and belief, the 2014 NATA results were not communicated to any lay persons and the citizens of St. Charles Parish, although the EPA Office of Inspector General (OIG) issued a management alert in March 2020 that called on the EPA, state, and/or local officials to provide information about EtO to the community and impacted residents who faced increased and "unacceptable" risks of cancer from certain facilities' EtO emissions, specifically including the Union Carbide facility. The 2020 OIG alert called on the EPA to conduct risk assessments of the identified facilities, including Union Carbide's, and to develop new emissions standards for facilities emitting EtO that are creating such

unreasonable risks for the community. The EPA's assessment confirmed that individuals living near the Union Carbide facility have a risk of developing cancer that is seven times what the EPA considers to be "acceptable." Although Defendants acknowledged reviewing the NATA results regarding the dramatically increased risk of cancer its EtO emissions created for the persons working and living around the facility and gave lip-service to "exploring" "ethylene oxide emission reduction opportunities" at its facility, it continued to emit large volumes of EtO into the atmosphere. And despite the OIG's 2020 alert, there was no public awareness initiative or campaign by the Defendants, the EPA, or any other local, state, or federal government agency to educate the community until 2021, when the first public outreach community meeting was organized by the EPA to inform local residents of the risk faced from living near the facility.

38. The first public community outreach meeting regarding the facility's EtO emissions was organized as a public webinar hosted by the EPA on August 19, 2021. The purpose of the meeting was to inform residents living near Union Carbide plant that they face an increased risk of developing cancer from the facility's EtO emissions and that the Defendants' EtO emissions controls do not sufficiently protect human health. Prior to that, notwithstanding the OIG's 2020 alert, no governmental agency nor any of the Defendants had taken any steps in the community to warn or inform residents like Plaintiff that the facility emitted EtO, that EtO is a carcinogen, that the levels of EtO emissions from the facility increased residents' risk of developing cancer, and that the facility's emissions controls are not sufficiently protective of human health.[6]

---

6   A transcript and video of the meeting is available on the EPA's website.

39. At that meeting, the EPA explained that, based on the cancer risk the facility's EtO emissions cause to the communities around it, the EPA considers the facility's emission levels to "not be sufficiently protective of human health" despite a reported reduction in emissions from 2014 to 2020. Even though the EPA advised that Union Carbide has decreased its EtO emissions from 2014 to 2020, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards even though within permitted limits.

40. Regarding the actual claimed reduction in emissions,[7] the EPA and Union Carbide Site Leader Denise DeLaune reported during the meeting that, after the 2014 NATA results were released to the Defendants and the EPA began asking the facility to take steps to reduce EtO emissions, the Defendants installed a new water scrubber (emissions control equipment) for a particular waste gas line and implemented a new process and system related to EtO vapors from the plant's railcar loading operation, both of which reduced EtO emissions into the air.

41. Ms. DeLaune also specifically acknowledged that Union Carbide and the facility have a responsibility to keep the community safe from any harm caused by the plant's EtO operations and emissions, stating that "no Community should bear an adverse environmental health outcome as a result of our operations." Ms. DeLaune also stated: "We know it's our responsibility to our Community, to use the best available, science and technology to end advanced monitoring capabilities to reduce emissions" and vaguely referenced a "community

---

[7] The Defendants also claim that there was a "reduction" in EtO emissions after 2014 because, upon their further review, they realized that they had been over-estimating certain emissions levels in the past. Allegedly, their "improved" reporting systems show a "reduction" in levels from some earlier years.

10

advisory panel" that the Defendants put together years ago and rely on with respect to the facility's duties and responsibilities to the communities around the facility.

42. Notwithstanding Ms. DeLaune's public statements and acknowledgements of the duties the facility has to "its" community, the plant and the individuals who manage and make decisions for it did nothing to protect the public for many years and has only recently started taking steps to reduce emissions as a result of government, regulatory, and public pressure despite that the steps taken were feasible long before any such external pressure was applied.

**Defendants have a duty to conform to the standards of care set forth in the EPA-approved state operating permit program, which is administered by the LDEQ and is set forth in L.A.C. 33:III.**

43. The permits issued to the facility by the LDEQ pursuant to L.A.C. 33:111 (the "Environmental Regulatory Code") limit the amounts of hazardous chemicals, including EtO, that may be discharged into the air and water and are intended to control such emissions. The permits and regulatory program address all aspects of emissions into the air and water, including the installation, operation, and maintenance of emission-control measures and equipment; emission-monitoring requirements; and leak-monitoring requirements and systems. The LDEQ's stated purpose in regulating emissions through these permits is to protect the health, safety, and welfare of the public.

44. The Environmental Regulatory Code requires the Defendants to conform their conduct to specific standards of care, including with respect to the control of emissions of air contaminants like EtO from the facility. Pursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at "point sources" where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions.

11

*E.g.*, L.A.C. 33:111.905; 33:III.2121. Stringent LDAR programs that effectively monitor for and result in quick repairs to leaks and other sources of unplanned fugitive emissions are mandated. In other words, the Defendants are required to act diligently to make every reasonable effort to limit and control both planned and unplanned releases of EtO into the air, regardless of whether ambient air quality standards in affected areas and permit limits are exceeded or not. Nevertheless, as made clear during the August 2021 community meeting regarding the facility, the Defendants failed to act reasonably and diligently in implementing systems and equipment to control planned EtO emissions from known source points (the gas line that needed a new scrubber and the railcar operations that were unnecessarily venting to the flare). Further, given the consistently large volumes of fugitive EtO emissions from leaks and faulty equipment, which emissions were not addressed at all by Defendants or the EPA at the community meeting, the Defendants have not conformed their conduct to the required standards of care to protect the public health of the Plaintiff and other residents who have lived and still live near the facility.

**Defendants' continued actions continue to cause injury to Plaintiff**

45. The facility has continuously emitted dangerous levels of EtO that are inhaled by Plaintiff and the tortious emission of EtO has never abated.

46. Plaintiff continues to suffer injury as a result of the Defendants' failure to abate the dangerous emission of EtO.

47. Plaintiff has already developed cancer, and Plaintiff also has an increased risk of developing additional illnesses, including additional cancer, as a result of the unabated emission of dangerous levels of EtO from the facility. Plaintiff's body is continuing to be damaged by

the continuous exposure to EtO emissions at the cellular level, and Plaintiff has a reasonable fear of developing additional cancers and illnesses.

48. Plaintiff's injuries to date and risk of future health problems are both the result of continuous, indivisible, and compounding tortious activities by Defendants.

**Plaintiff did not reasonably know that it was the Defendants' acts and omissions described above that caused their injuries and damages until less than a year before this lawsuit was filed. (all plaintiff except**

49. As a result of the above-described acts and omissions by the Defendants, exposure to the unsafe levels of EtO from the Facility was a substantial factor in Plaintiff's development of cancer and is a substantial factor in development of future health problems.

50. Defendants' misrepresentations about the carcinogenic quality of EtO impeded Plaintiff's ability to assert the causes of action stated herein and Defendants' actions and inactions did, in fact, delay Plaintiff's discovery that the cancers and risks of cancer alleged herein had been caused by exposure to EtO.

51. Although Plaintiff was diagnosed with cancer more than a year before filing suit, Plaintiff did not know or should not have reasonably known that her cancer was caused by exposure to the EtO emitted by the facility before one year prior to the date of the original Petition.

52. Plaintiff did not have any reasonable access to or knowledge of the body of industry and scientific information regarding the dangers of EtO. Nor did she know about the 2014 NATA results, as those results were not widely publicized to lay persons in the communities around the facility until after this suit was filed. No one with access to that kind of information and with an understanding of the dangers Plaintiff faced from living near the facility or her elevated risk of developing cancer provided information to the community where she lives until August 2021, when the EPA finally organized a public community outreach meeting

53. Plaintiff continues to be exposed to unsafe levels of EtO from the facility, suffers successive damages to her body and mind as a result of her continuous exposure to the dangerous emissions, and faces an ongoing risk of adverse effects to her health and development of additional cancer.

54. Gia Lewis Grows lived within 3 miles of the facility until 2007 and was diagnosed with breast cancer in July of 2015. Despite discussions with her doctors, no physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

## CAUSES OF ACTION

### Count 1 – Negligence of Union Carbide and/or Dow

55. Union Carbide and/or Dow have a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including Plaintiff,

especially given its superior knowledge and understanding of the dangers of EtO emissions and the likelihood that those emissions were contaminating the air in the communities around the facility.

56. Union Carbide and/or Dow knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable or sufficiently protective of human health.

57. Union Carbide and/or Dow knew or should have known that that its/their EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

58. As the operator of the facility with control over the levels of EtO released from the facility, Union Carbide and/or Dow owes a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that do not pose an unreasonable risk of harm. Union Carbide and/or Dow has breached that duty by, among other things, emitting EtO from facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including Plaintiff. Furthermore, Union Carbide and/or Dow's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by Plaintiff.

59. Union Carbide has expressly acknowledged to the public that it has a duty to keep the community safe from any harm caused by the plant's EtO operations and emissions and that it has imposed on itself a duty "to use the best available, science and technology … to reduce emissions" and relies on its own "community advisory panel" to assist it with meeting these internal standards. Union Carbide has not conformed its conduct to these standards of care

that it has set for the facility, and its breaches of those standards is negligence that has caused actual harm to the Plaintiff.

60. Union Carbide and/or Dow also owes a duty to the residents living near the facility to conform their conduct and the facility's EtO emissions to the standards of care set out in the Environmental Regulatory Code regarding emissions controls, including through acting diligently and reasonably to control and limit planned emissions and unplanned fugitive emissions. Defendants breached that duty by, among other things, not implementing and maintaining the facility's emissions control systems and equipment in a reasonably diligent manner and by negligently failing to detect and repair leaks and faulty systems and equipment in a reasonable and diligent manner that resulted in unnecessary EtO emissions from known source points as well as extremely large volumes of fugitive EtO emissions from the facility into the atmosphere.

61. Union Carbide and/or Dow's actions were both a cause in fact and legal cause of these harms. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to Plaintiff.

62. The facility has at all relevant times been in the custody and control of Union Carbide and/or Dow.

63. Union Carbide and/or Dow knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including Plaintiff.

64. Union Carbide and/or Dow could have prevented the harms suffered by the Plaintiff through the exercise of reasonable care, namely by conforming their conduct and the facility to the standards of care set forth in the Environmental Regulatory Code and reducing or eliminating

the emission of EtO from the facility through effective and well-maintained emissions control systems and leak detection and repair. Union Carbide and/or Dow chose not to exercise such reasonable care, and their failure is both a cause in fact and legal cause of Plaintiff's damages.

65. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to Plaintiff.

66. Union Carbide and/or Dow has been, and continues to be, negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level through properly designed, maintained and operated emissions control systems and equipment;

    d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

f.) Failing to implement and maintain a stringent LDAR program and negligently allowing excessive and dangerous levels of fugitive EtO emissions from the facility;

g.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiff to dangerous levels of EtO;

h.) Failing to take proper preventative measures and safeguards to sufficiently protect public health and safety;

i.) Failing to know what it should have known;

j.) Failing to use to use the best available, science and technology to reduce emissions;

k.) Misleading Plaintiff and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

**Count 2 – Union Carbide and/or Dow's Liability under La. C.C. arts. 667-669**

67. Union Carbide and/or Dow has a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. Union Carbide and/or Dow is required to use its property - the facility - in such a manner as not to injure its neighbors.

68. Plaintiff lives near the facility and was, and continues to be, continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiff's cancer and Plaintiff's fear of and risk of developing further health problems. Plaintiff lives or has lived in close proximity to the facility and has been and continues to be damaged by exposure to the dangerous emissions released by the facility.

69. Union Carbide and/or Dow knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including Plaintiff. The damages caused to Plaintiff could have been prevented if Union Carbide and/or Dow had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air upon its purchase of the facility, but it/they for decades failed to take any steps to reduce EtO emissions, and it/they still have not reduced EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to Union Carbide and/or Dow's neighboring community.

## **DAMAGES**

70. Because of the aforementioned intentional misconduct and negligence of defendants, Plaintiff has suffered severe and disabling injuries, for which she seeks the following damages:

    a.) Past, present, and future pain and suffering;

    b.) Past, present, and future medical expenses;

    c.) Permanent and/or partial physical disability and/or impairment;

    d.) Scarring and disfigurement;

    e.) Past, present, and future loss of enjoyment of life;

    f.) Future loss of income;

    g.) Future loss of earning capacity;

    h.) The fear and increased likelihood of development of other cancers and other fatal and debilitating diseases;

    i.) The fear and increased likelihood of development of damage to vital organs, reproductive system and central nervous system

    j.) The fear of early death.

71. Plaintiff prays for a trial by jury.

WHEREFORE, Plaintiff prays that, after due proceedings had, there be judgment herein in favor of Plaintiff and against Defendants for such damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid; for all costs of this proceeding; and for all other general and equitable relief to which they are entitled.

Respectfully Submitted:

**RICHARD P. VOORHIES III (#30782)**
**WILLIAM A. BAROUSSE (#29748)**
THE VOORHIES LAW FIRM
1100 Poydras Street
Energy Center, Suite 2810
New Orleans, LA 70163
Phone: 504-875-2223
Fax: 504-875-4882
Email: richard@voorhieslaw.com
Email: william@voorhieslaw.com

-and-

By: */s/ Jennifer Thornton*
**JENNIFER THORNTON (#27109)**
**BRANDON A. NAQUIN (#39998)**
STANLEY, REUTER, ROSS, THORNTON
 & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Phone: 504-523-1580
Fax: 504-524-0069
jlt@stanleyreuter.com
ban@stanleyreuter.com

*Counsel for Plaintiff*